UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
ELANA L. YEGER and ITAMAR YEGER,      :
individually and on behalf of J.Y.,   :
                    Plaintiffs,       :
                                      :         **OPINION AND ORDER**
v.                                    :
                                      :         21 CV 6822 (VB)
THE EAST RAMAPO CENTRAL SCHOOL        :
DISTRICT,                             :
                    Defendant.        :
----------------------------------------------------------------x

Briccetti, J.:

Plaintiffs Elana L. Yeger and Itamar Yeger (the "Parents"),[1] the parents of student J.Y., a child with a disability as defined by the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 ("IDEA"), bring this action against the East Ramapo Central School District (the "District") pursuant to the IDEA.

The Parents seek reversal of the New York State Education Department state review officer's ("SRO") decision, which reversed the impartial hearing officer's ("IHO") decision and determined, over the Parents' objections, that J.Y.'s proposed placement at a therapeutic day-treatment program at River View High School offered J.Y. a free appropriate public education ("FAPE") for the 2019–2020 and 2020–2021 school years. The District seeks to uphold the SRO's decision.

Now pending are the parties' cross-motions for summary judgment. (Docs. ##19, 20).

For the reasons set forth below, the Parents' motion is DENIED, and the District's motion is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

---

[1]     The Parents, who are proceeding pro se, are both attorneys.

**BACKGROUND**

I.     Statutory Framework

The IDEA was enacted to promote the education of disabled children.  20 U.S.C.

§ 1400(d)(1)(A); see Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S.

176, 179 (1982) (interpreting predecessor statute to IDEA).[2]  States receiving federal funds are

required to provide a FAPE to children with disabilities.  20 U.S.C. § 1412(a)(1)(A).  Public

school districts must provide "'special education and related services' tailored to meet the unique

needs of a particular child, [which are] 'reasonably calculated to enable the child to receive

educational benefits.'"  Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998)

(first quoting 20 U.S.C. § 1401(a)(18); then quoting Bd. of Educ. of the Hendrick Hudson Cent.

Sch. Dist. v. Rowley, 458 U.S. at 207).

States have an obligation under the IDEA to identify, locate, and evaluate "[a]ll children

with disabilities residing in the State" to determine whether they require special education and

related services.  20 U.S.C. § 1412(a)(3)(A); see Handberry v. Thompson, 446 F.3d 335, 347 (2d

Cir. 2006).  This so-called "child find" obligation extends to children who are "suspected of

being a child with a disability."  34 C.F.R. § 300.111(c)(1).

The IDEA requires states to create an IEP for each disabled student.  See 20 U.S.C.

§ 1412(a)(4); see also Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006)

("The key element of the IDEA is the development of an IEP for each handicapped child.").  The

IEP is a "comprehensive statement of the educational needs of a handicapped child and the

specially designed instruction and related services to be employed to meet those needs."  Sch.

Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368 (1985) (citing 20 U.S.C. § 1401(19)).

---

[2]     Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

In New York State, the responsibility for developing IEPs is assigned to local

Committees on Special Education ("CSE").  See N.Y. Educ. Law § 4402(1)(b)(1); R.E. v.

N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012).  "CSEs are comprised of members

appointed by the local school district's board of education, and must include the student's

parent(s), a regular or special education teacher, a school board representative, a parent

representative, and others."  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 175.  "The CSE must

examine the student's level of achievement and specific needs and determine an appropriate

educational program."  Id.

The IDEA requires a school district to send prior written notice to a child's parents when

the school district proposes or refuses to initiate or change "the identification, evaluation, or

educational placement of the child, or the provision of a [FAPE] to the child."  20 U.S.C.

§ 1415(b)(3).  If the parents believe the state failed to provide a FAPE to a disabled child, the

parents may enroll the child in a private school and seek reimbursement for the cost of the

private school from the local board of education.  See 20 U.S.C. § 1412(a)(10)(C); Sch. Comm.

of Burlington v. Dep't of Educ., 471 U.S. at 369–70, 374.  The parents must provide notice ten

business days before removing the child from the public school.  20 U.S.C. § 1412(a)(10)(C)(iii).

In New York, parents seeking such reimbursement must then file a "due process

complaint" challenging the appropriateness of the IEP.  FB v. N.Y.C. Dep't of Educ., 923 F.

Supp. 2d 570, 577 (S.D.N.Y. 2013).  A school district must respond within ten days of receiving

the complaint, unless the school district has already sent prior written notice to the parent

regarding the subject matter of the due process complaint.  20 U.S.C. § 1415(c)(2)(B)(i)(I); 34

C.F.R. § 300.508(e).  The school district's response must address the issues raised in the

complaint and include specific information outlined in 20 U.S.C. § 1415(c)(2)(B)(i).

Separately, a school district must convene a resolution meeting within fifteen days of receiving notice of the parents' due process complaint.  20 U.S.C. § 1415(f)(1)(B)(i); 34 C.F.R. § 300.510(a)(1).  "The purpose of the meeting is for the parent of the child to discuss the due process complaint, and the facts that form the basis of the due process complaint, so that the [school district] has the opportunity to resolve the dispute that is the basis for the due process complaint."  34 C.F.R. § 300.510(a)(2).  The school district has thirty days from receipt of the complaint to "resolve[] the complaint to the satisfaction of the parents."  20 U.S.C. § 1415(f)(1)(B)(ii).  If the parties resolve the complaint, they must execute a legally binding agreement, signed by the parent and a school district representative, that sets forth the resolution. Id. § 1415(f)(1)(B)(iii).  If the parties fail to resolve the complaint, they may proceed with a due process hearing.  Id. § 1415(f)(1)(B)(ii).

An IHO conducts the due process hearing on the parents' complaint.  See N.Y. Educ. Law § 4404(1).  A board of education is required to reimburse parents for private educational services if:  (i) the board fails to establish the student's IEP provided a FAPE; (ii) the parents establish the unilateral placement selected by the parents was appropriate; and (iii) equitable considerations favor the parents' claim.  See Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12–16 (1993); M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013).  The IHO's decision may be appealed to an SRO at the New York State Education Department.  See N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g).  The SRO's decision may then be challenged in federal court.  See 20 U.S.C. § 1415(i)(2)(A).

II.   Factual Background

The parties have submitted briefs, declarations, and the record and exhibits from the IHO and SRO proceedings, which reflect the following factual background.[3]

J.Y. is a student with a disability as defined by the IDEA.

J.Y. has never attended a public school.  J.Y. attended Yeshiva Darchei Noam, a general education religious private school, from ages four through thirteen, before enrolling at Yeshiva High School of Monsey, another religious private school, for the start of the 2017–2018 school year (ninth grade).

On March 13, 2018, the Parents informed the District a psychologist had diagnosed J.Y. with attention-deficit/hyperactivity disorder ("ADHD"), nonverbal learning disorder, and an unspecified mood disorder.  The Parents requested that the District evaluate J.Y.

On April 6, 2018, before the District completed the evaluation, the Parents switched J.Y.'s enrollment to Barnstable Academy in New Jersey ("Barnstable"), where J.Y. completed the rest of the 2017–2018 school year.  Barnstable is not approved as a New York State Department of Education special education school.[4]

On May 7, 2018, J.Y.'s CSE met for the first time.  The CSE classified J.Y.'s disability as Emotional Disturbance and recommended placement in a Board of Cooperative Educational Services ("BOCES") therapeutic 12:1+2 program—meaning a class of up to twelve students, one special education teacher, and two teaching assistants—operated at Tappan Zee High School in

---

[3]   Citations to the "IHO Decision" refer to the IHO's Decision & Order, dated January 27, 2021.  (Doc. #21-3).  Citations to the "SRO Decision" refer to the SRO's Decision, dated April 19, 2021.  (Doc. #21-2).  Citations to "J-[ ]" refer to the Joint Exhibits comprising the record before the IHO.  The exhibits, the IHO Decision, and the SRO Decision are each individually paginated; the Court refers to those page numbers when citing to the documents.

[4]   The Parents are not seeking, and in the proceedings below did not seek, reimbursement for J.Y.'s placement at Barnstable.

Rockland County ("Tappan Zee") for the 2018–2019 school year (tenth grade).  The Tappan Zee placement included one thirty-minute individual counseling session and one thirty-minute small group counseling session each week, as well as a positive reinforcement plan that provided J.Y. with refocusing and redirection throughout the school day.

The Parents, however, did not accept the CSE's recommendation and decided to keep J.Y. at Barnstable for tenth grade.  Accordingly, the District provided transportation services for J.Y. to attend Barnstable, where he remained until April 3, 2019.

On April 3, 2019, the Parents transferred J.Y. to Aspiro Wilderness Therapy in Mt. Pleasant, Utah ("Aspiro"), for the remainder of the 2018–2019 school year.  Aspiro is a residential wilderness program for adolescents with behavioral and mental problems; it is not a New York State Department of Education-approved special education placement.  J.Y. remained at Aspiro until July 4, 2019.[5]

A.      2019–2020 School Year

On June 20, 2019, J.Y.'s CSE met to discuss J.Y.'s IEP for the 2019–2020 school year (eleventh grade).  Representatives of Barnstable and Aspiro attended.

Based on a private neuropsychological evaluation dated June 7, 2019, by Dr. Nicole Stewart, a Utah psychologist, the CSE changed J.Y.'s disability classification from Emotional Disturbance to Autism.  The CSE discussed J.Y.'s most recent placement at Aspiro, and the Parents indicated they wanted J.Y. placed in a residential treatment center for the upcoming

---

[5]      The Parents are not seeking, and in the proceedings below did not seek, reimbursement for J.Y.'s placement at Aspiro.

school year.  In addition, the Parents informed the CSE that J.Y. "was very physically aggressive at home and that older siblings had to move out of the house."  (J-15 at 2).

The CSE, however, disagreed with the Parents and recommended placement in an 8:1+1 special class—meaning a class of up to eight students, one special education teacher, and one teaching assistant—at BOCES River View High School in Rockland County ("River View").  The River View placement was a therapeutic day-treatment program with intensive daily counseling, including individual psychological counseling sessions twice a week for thirty minutes and a positive reinforcement plan implemented throughout the school day.  The special class would use project-based learning and have students work independently in small groups.  The program incorporated a functional behavioral analysis and creation of behavioral intervention plans.  J.Y. would have additional time to take tests.

Every staff member at River View was trained in applied behavioral analysis and a psychologist would be in class at all times.  The program would also provide one sixty-minute session per month of parent counseling and training and other "wrap-around services," such as access to a clinical social worker, to help J.Y.'s family access services and support for use at home.

The CSE recommended River View, which was more restrictive than the prior year's Tappan Zee recommendation, because J.Y.'s behavioral issues had reportedly worsened during the prior year.  However, in recommending a day-treatment program, as opposed to a residential placement, the CSE considered that J.Y. was not physical or aggressive at school like he was at home, and that he developed successful relationships with peers and staff at school.  Moreover, the CSE's recommendation reflected that J.Y. was a bright student capable of academically performing at grade-level.  The CSE's recommendation also accounted for how close J.Y. was to

his family, corroborated by Dr. Stewart's finding that J.Y.'s family relationships were "a strong asset for [J.Y.] as he progresses through his treatment." (J-21 at 6). Therefore, the CSE concluded River View was the least restrictive placement that would allow J.Y. to make educational progress.

The Parents declined to follow the CSE's recommendation, maintaining that only a residential placement would meet J.Y.'s needs. Thus, on June 20, 2019, the same day as the CSE meeting, the Parents notified the District they intended to place J.Y. at Heritage Residential Treatment Center in Provo, Utah ("Heritage"), for the 2019–2020 school year and to seek tuition reimbursement from the District. Heritage is not approved by New York State to provide educational services to students with disabilities.

On July 11, 2019, the CSE reconvened to discuss J.Y.'s IEP in response to the Parents' notice. The Parents expressed concern about River View because the therapists and other professionals working with J.Y. felt he needed a residential placement. The CSE, however, determined a residential placement was too restrictive and maintained their recommendation of the therapeutic day-treatment program at River View.

The Parents declined to follow the CSE's recommendation and J.Y. remained at Heritage during the 2019–2020 school year (eleventh grade).

On October 24, 2019, the Parents filed an Impartial Hearing Request alleging the District failed to offer J.Y. a FAPE and seeking reimbursement for J.Y.'s placement at Heritage during the 2019–2020 school year.[6]

---

[6]     The Impartial Hearing Request also claimed the 2018–2019 IEP did not provide J.Y. a FAPE. The IHO denied this claim and concluded the District's recommended "therapeutic day-treatment setting was reasonably calculated to enable [J.Y.] to make grade-level progress in light of his circumstances," which the Parents did not appeal to the SRO. (IHO Decision at 20).

B.     2020–2021 School Year

On June 10, 2020, while the Parents' Impartial Hearing Request was pending, the CSE

met to discuss J.Y.'s IEP for the 2020–2021 school year (twelfth grade).  At the meeting, the

CSE considered reports that J.Y., although a bright student, continued to struggle behaviorally at

Heritage, including "94 breaks and 46 class refusals [during the] last term."  (J-35 at 1).  The

CSE learned J.Y. had been on academic probation thirty percent of the third term, but Heritage

staff saw behavioral and academic improvements after the school shifted to a project-based

learning model.  (J-35 at 1).

The CSE also heard testimony from J.Y.'s therapist at Heritage that J.Y. struggled when

the COVID-19 pandemic hit and she feared J.Y. did not "have the stamina to undergo another

change [to a day-treatment program] and remain stabilized," although, as a student entering

twelfth grade, the Heritage representatives acknowledged J.Y. would "need to transition at one

time or another."  (J-35 at 3).

The CSE discussed potential residential placements closer to J.Y.'s home than Heritage,

but determined a residential placement would be too restrictive.  The CSE also noted J.Y. had

never attended a comprehensive therapeutic program to help meet his needs in a less restrictive

setting than a residential placement.

Thus, the CSE again recommended placement at River View, but with changes to the IEP

program to add a small group counseling session for thirty minutes once a week, special seating

arrangements in class, breaks during the school day as needed, a modified curriculum, support

for transitions (i.e., a teacher who would check in with J.Y. within five minutes of him starting an assignment and five minutes before a class ended), and additional testing accommodations.

The CSE also recommended J.Y. attend River View during summer 2020 in an 8:1+1 special BOCES class, with one thirty-minute session of individual counseling per week, one thirty-minute session of small group counseling per week, and one sixty-minute session of parent counseling and training per month.

The Parents declined to follow the CSE's recommendation and maintained J.Y.'s placement at Heritage for the 2020–2021 school year.

On August 4, 2020, the Parents amended their Impartial Hearing Request to add a claim that the District failed to offer J.Y. a FAPE for the 2020–2021 school year and to seek tuition reimbursement for J.Y.'s placement at Heritage that year (the "Amended Request").

III.    Procedural Background

    A.    IHO Hearing and Decision

IHO Jerome D. Schad, Esq., presided over a hearing spaning six days between October 14 and November 6, 2020 (the "IHO Hearing").  Twelve witnesses testified during the hearing, including J.Y.'s mother, the District's school psychologist, members of J.Y.'s CSE, a mental health counselor from Aspiro, a special education teacher and clinical worker from Heritage, and Dr. Stewart.

Regarding the 2019–2020 school year, the IHO found the educational components of the District's IEP were appropriate.  Specifically, he cited testimony from an Aspiro representative, Amanda Cencak, that the IEP goals for the River View program were the same as Ms. Cencak's recommended goals—namely, a smaller therapeutic environment.  The IHO also determined the District's school psychologist testified credibly that, although Dr. Stewart recommended a

residential placement, all twelve of her specific recommendations following her evaluation of

J.Y. would be met at River View, and none of Dr. Stewart's recommendations required a

residential placement to be implemented.[7]

Conversely, the IHO noted the Parents and other witnesses who advocated for a

residential placement, including Ms. Cencak and Heritage staff, believed "a residential treatment

center was a natural placement progression for child [sic] who had participated in a wilderness

program."  (IHO Decision at 26–27).

Ultimately, the IHO concluded a residential placement was necessary for J.Y. to access

his education, and the Parents' unilateral placement at Heritage was "minimally appropriate" to

allow him to do so.  (IHO Decision at 34).

This conclusion was based on J.Y.'s "failed experience in the fourth quarter at Barnstable

in the 2018–2019 school year, his frequent melt downs while at Aspiro, and the majority of

evidence of the Student's behavioral functioning," which the IHO felt "support[ed] a conclusion

that even the well-defined IEP for a day-treatment program would not be able to meet [J.Y.'s]

behavioral needs in order for him to access his education."  (IHO Decision at 27).

The IHO reasoned that "all those who tried to work closely with [J.Y.], including his

Parents, were unable to get him to consistently participate in his educational program and he

---

[7]      Dr. Stewart recommended:  (i) placement in a residential setting to "provide a high level
of structure and predictability" for J.Y.; (ii) individual therapy, with a particular focus on
unpacking the symptoms of Autism Spectrum Disorder, improved social and perspective
awareness, labeling and better understanding of J.Y.'s emotions, and a deeper understanding of
his own anxiety; (iii) mindfulness practices; (iv) family therapy; (v) education for J.Y.'s family
about Autism Spectrum Disorder; (vi) developing healthy technology use; (vii) developing social
thinking; (viii) developing predictable routines and learning to respond to changes in routine;
(ix) teaching J.Y. to advocate for his rights under the Americans with Disabilities Act;
(x) gearing J.Y.'s learning and treatment through challenging but not overwhelming tasks, with
the right support; (xi) ongoing treatment by a psychiatrist; and (xii) supervised social experiences
and recreational activities.  (See J-21 at 22–25).

would regularly walk off, refuse to participate, or otherwise refuse to comply with an age-appropriate boundary." (IHO Decision at 27–28). As a result, the IHO was persuaded "a residential program offer[ed] more consistency and predictability" for J.Y.'s environment to facilitate his transition towards returning back to his family. (Id. at 28)

Accordingly, because the IHO determined a residential program was required for J.Y. to access his education, the IHO held the District's IEP did not offer J.Y. a FAPE for the 2019–2020 (eleventh grade) school year.

Regarding the 2020–2021 (twelfth grade) school year, the IHO also agreed with the Parents that only a residential program would meet J.Y.'s needs, and accordingly, the District's IEP did not offer J.Y. a FAPE for that year. Acknowledging J.Y.'s "incidents of breaks and class refusals at Heritage" before Heritage implemented a project-based learning model, the IHO determined these incidents were "evidence that Heritage is not the right residential program for the Student rather than evidence that a residential setting was not needed to address the Student's rigid thinking patterns, emotional dysregulation and tendency to 'get stuck in his own ways of understanding or perceiving situations.'" (IHO Decision at 30 (quoting J-21 at 21)).

The IHO also noted the COVID-19 pandemic required a change from in-person summer school to a remote model for summer 2020, which the IHO found "would not have made it possible for [J.Y.] to transition into the River View program in September 2020." (IHO Decision at 30).

Having determined the District failed to offer J.Y. a FAPE for both years, the IHO next considered whether the Parents' unilateral placement at Heritage was appropriate.

The IHO determined "the Heritage program was only minimally appropriate and [J.Y.'s] behavioral progress was, at best, de minimis." (IHO Decision at 34). The IHO reasoned that

although J.Y. made little behavioral progress, he improved academically after Heritage

implemented a project-based learning model.  However, the IHO noted the Heritage placement

was:

> two-thousand miles away from [J.Y.'s] home.  Such a distant placement is not
> compelled by any evidence in this record.  For a child, whose connection with his
> family is strong, a residential setting that far from his home and home school district
> is simply inappropriate under the IDEA's least restrictive environment standard.

(Id. at 33).

Finally, noting the Parents participated in all aspects of the CSE process and the

development of the IEPs, and the Parents "earnestly sought what they believed was appropriate

and best for their son," the IHO concluded the equities did not bar the Parents' claims for

reimbursement, "except as they relate to the choice to place [J.Y.] in a residential setting two

thousand miles from his home."  (IHO Decision at 34).

Accordingly, the IHO granted the Parents fifty percent of their claim for reimbursement

for tuition and costs at Heritage for the 2019–2020 and 2020–2021 school years.  The IHO also

awarded the Parents reimbursement for fifty percent of J.Y.'s travel expenses to and from

Heritage for both school years and for up to two trips per academic year for the Parents to travel

to and from Heritage.

   B.  SRO Review

The District appealed the IHO's determination that the District failed to provide J.Y. a

FAPE during the 2019–2020 and 2020–2021 school years and the IHO's grant of partial

reimbursement for each year.  Primarily, the District argued it was error for the IHO to find J.Y.

required a residential setting despite determining the educational components of the IEPs were

appropriate.  The District also argued the IHO's determination that the recommended summer

services at River View would not have been viable because they were ultimately provided

remotely was in error.  Finally, the District argued the IHO should not have awarded tuition

reimbursement because the IHO correctly found there was "very little evidence" Heritage was an

appropriate placement, including for being too far from J.Y.'s home.  (SRO Decision at 7).

The Parents cross-appealed the IHO's decision, asserting they were entitled to <u>full</u>

reimbursement because the IHO found J.Y. required a residential setting and J.Y. made progress

at Heritage.  The Parents also argued remote instruction for summer 2020 was not appropriate for

J.Y.

The SRO, Sarah L. Harrington, concluded the record did not support the IHO's

determination that the District failed to offer J.Y. a FAPE for the 2019–2020 and the 2020–2021

school years.  Thus, she reversed the IHO's decision to award the Parents partial reimbursement.

Regarding the 2019–2020 school year, the SRO reasoned the "chief argument" the IHO

credited for the necessity of a residential program was that it offered more consistency and

predictability for J.Y., but nothing in the record suggested River View would not offer

consistency and predictability.  (SRO Decision at 18).  The SRO disagreed with the IHO's

conclusion that J.Y. would not make academic progress outside a residential program,

particularly because the IHO determined the IEP's "educational components were very

appropriate to meet [J.Y.'s] needs."  (<u>Id</u>. at 19).  Instead, the SRO concluded River View, as "a

therapeutic program designed to address the needs of student's [sic] with anxiety and

social/emotional deficits," could meet J.Y.'s clinical needs and allow him to receive educational

benefits.  (<u>Id</u>.).

Considering testimony by a Barnstable social worker that J.Y.'s negative behavior would

sometimes increase during the 2018–2019 year when he attended day school, including walking

out of classrooms or resisting  schoolwork, the SRO referred to testimony by the CSE

Chairperson that Barnstable was not a special education school and nothing suggested J.Y. received counseling or support services during his placement there.

The SRO also referred to testimony from representatives of Barnstable and Aspiro that "although [J.Y.] had great difficulty coping with his frustration, he was not physical or aggressive toward others or property in school," he had "great friends and no social issues," and he was "not destructive [at school] as the parents reported that he was in the home." (SRO Decision at 16). Indeed, the SRO referred to testimony by J.Y.'s case manager that the River View program "was designed to accommodate 'emotionally fragile' students with anxiety and 'social issues' that had difficulty regulating their emotions comparable to [J.Y.]", and J.Y. would benefit from remaining in his home environment. (Id. at 17).

Further, the SRO cited testimony from the CSE Chairperson that J.Y. was a bright student and not exhibiting the aggressiveness at school that he was exhibiting at home, such that J.Y. needed to be "with his family and work out whatever issues existed." (SRO Decision at 17). Likewise, the SRO cited testimony from the District psychologist that River View was recommended because J.Y. was "'academically and cognitively' intact but had 'fairly significant social and emotional challenges.'" (Id.).

In light of this evidence, the SRO concluded the record supported a finding that the River View program was "appropriately designed to enable [J.Y.] to make progress" in the least restrictive environment, and therefore the District offered J.Y. a FAPE for the 2019–2020 school year. (SRO Decision at 19).

Regarding the 2020–2021 school year, as an initial matter, the SRO noted the Amended Request did not include allegations related to the District's use of a remote learning program

during summer 2020. Thus, the SRO concluded that issue, raised by the Parents during the IHO proceedings, was outside the scope of both the impartial hearing and the appeal before the SRO.

As to whether the 2020–2021 IEP offered J.Y. a FAPE, the SRO cited testimony from J.Y.'s case manager that, based on reports from Heritage, J.Y. regressed during his first year at Heritage, including that "he had to be physically restrained in '16 instances,' refused to attend class, refused to do schoolwork, and left the residential home, all of which 'carried over into the academic component,'" as he "struggled to stay in class and 'had 46 class refusals and took 94 breaks.'" (SRO Decision at 22). The case manager testified this behavior "indicated that Heritage was 'not addressing [J.Y.'s] needs and [Heritage was] unable to 'de-escalate him' and 'provide him with the right coping mechanisms.'" (Id.).

The SRO disagreed with the IHO's conclusion that J.Y.'s behavior at Heritage demonstrated only that it was not the right residential program, concluding instead that J.Y.'s "experiences in Heritage are not supportive of a finding that [J.Y.] would benefit from a residential placement." (SRO Decision at 23). The SRO referred to the observation by the June 2020 CSE that J.Y. had "never attended a comprehensive therapeutic [day] program to help meet his needs in a less restrictive setting." (Id.).

Although the private psychologist and providers who treated J.Y. recommended a residential placement, the SRO concluded the evidence in the record did not support the necessity of a residential placement. Instead, considering the least restrictive environment standard, the SRO concluded the record indicated the District's placement offered J.Y. a FAPE for the 2020–2021 school year.

Because the SRO determined the District offered J.Y. a FAPE for each year at issue, the SRO did not reach the questions of whether Heritage was an appropriate unilateral placement for

J.Y. or whether equitable considerations supported the Parents' request for tuition and travel reimbursement.

## DISCUSSION

### I.   Standard of Review

In federal court, parties seeking review of administrative decisions in cases brought under the IDEA usually do so by motion for summary judgment.  See Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  However, unlike in an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the motion.  Id.  Rather, summary judgment in an IDEA case functions as an appeal from an administrative decision.  T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (per curiam).

In this context, the Court:  (i) reviews the record of the administrative proceedings; (ii) hears additional evidence at the request of a party; and (iii) grants such relief as it deems appropriate based on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(C).

"The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007).  The standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012).

"[T]he deference owed to an SRO's decision depends on the quality of that opinion." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 189.  "Reviewing courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater

familiarity with the evidence and the witnesses than the reviewing court." Id.  The Second

Circuit's approach requires district courts to consider the following:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded
> more weight than determinations concerning whether the IEP was developed
> according to the proper procedures.  Decisions involving a dispute over an
> appropriate educational methodology should be afforded more deference than
> determinations concerning whether there have been objective indications of
> progress.  Determinations grounded in thorough and logical reasoning should be
> provided more deference than decisions that are not.  And the district court should
> afford more deference when its review is based entirely on the same evidence as
> that before the SRO than when the district court has before it additional evidence
> that was not considered by the state agency.

M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 244.

Under such deferential review, "[w]here the IHO and SRO disagree," the Court "defer[s]

to the reasoned conclusions of the SRO as the final state administrative determination."  C.F. ex

rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 77 (2d Cir. 2014).  However, where the SRO's

determinations are insufficiently reasoned to merit deference, the courts should defer to the

IHO's analysis.  Id.

Accordingly, a district court "must defer to the SRO's decision on matters requiring

educational expertise unless it concludes that the decision was inadequately reasoned, in which

case a better-reasoned IHO opinion may be considered instead."  R.E. v. N.Y.C. Dep't of Educ.,

694 F.3d at 189.  This reflects that the "IDEA's statutory scheme requires substantial deference

to state administrative bodies on matters of educational policy," and district court review of such

decisions is "by no means an invitation to the courts to substitute their own notions of sound

educational policy for those of the school authorities which they review."  Cerra v. Pawling Cent.

Sch. Dist., 427 F.3d 186, 191–92 (2d Cir. 2005).

II.    Tuition Reimbursement

Claims for tuition reimbursement are "governed by the Burlington/Carter Test, which looks to (1) whether the school district's proposed plan will provide the child with a [FAPE]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities."  C.F. v. N.Y.C. Dep't of Educ., 746 F.3d at 76); see generally Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369; Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. at 12.  The school district has the burden of proving its IEP offered the student a FAPE.  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 184 (citing N.Y. Educ. Law § 4401(c)).  If the district "fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them."  Id. at 185.

III.    FAPE

The IDEA requires states receiving federal funds to provide a FAPE to "all children with disabilities."  Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 376 (2d Cir. 2014) (quoting 20 U.S.C. § 1412(a)(1)(A)).  "A FAPE consists of special education and related services tailored to meet the unique needs of a particular child, which are reasonably calculated to enable the child to receive educational benefits."  Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ., 760 F.3d 211, 214 (2d Cir. 2014).

To decide whether an IEP complies with the IDEA, courts follow a two-part test.  See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206–07.  First, courts examine the procedural adequacy of the IEP, asking "whether the state has complied with the procedures set forth in the IDEA."  R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 190.

Second, courts examine the substantive adequacy of the IEP to determine whether "an IEP [is] reasonably calculated to enable a child to make progress appropriate in light of the

child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 (2017).  "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." Id.  "The IEP must aim to enable the child to make progress.  After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." Id.  Indeed, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential." Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 199.  "[C]hallenges to a school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation." M.O. v. N.Y.C. Dep't of Educ., 793 F.3d at 244.

Moreover, "[b]ecause the law expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 122; 20 U.S.C. § 1412(a)(5)(A).

Because every child is unique, "determining whether a student has been placed in the 'least restrictive environment' requires a flexible, fact-specific analysis." P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed., 546 F.3d 111, 113 (2d Cir. 2008).  "Pursuant to that test, a court should consider, first, whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child, and, if not, then whether the school has mainstreamed the child to the maximum extent appropriate." Id. at 120.  "Only 'when the nature or severity' of a child's disability is such 'that education in regular classes with

the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d at 122 (quoting 20 U.S.C. § 1412).

New York law requires there be "no appropriate nonresidential school available consistent with the needs of the child" before a CSE may recommend a residential placement. N.Y. Educ. Law. § 4402(2)(b)(2). This aligns with the "IDEA's preference . . . for disabled children to be educated in the least restrictive environment capable of meeting their needs" and the reality that a "residential placement is, by its nature, considerably more restrictive than local extended day programming." Walczak v. Fla. Union Free. Sch. Dist., 142 F.3d at 132.

IV.    Application

The Parents do not raise procedural challenges to the development of J.Y.'s IEPs. Instead, their dispute centers on whether J.Y.'s IEPs recommending a therapeutic day-treatment program offered him a FAPE.

Regarding both years, the Parents assert two primary arguments.[8] First, they argue the Court should defer to the IHO's decision because the IHO presided over the impartial hearing, and therefore received live testimony from the witnesses, whereas the SRO rendered its decision from "review of the cold record." (Doc. #19 ("Parents Opp.") at 2). Second, the Parents argue

---

[8]    The Parents assert a third argument that the River View placement for 2020–2021 failed to offer a FAPE because the recommended summer services would have been provided remotely because of the COVID-19 pandemic. The Court agrees with the SRO that this argument is not properly within the scope of the Parents' appeal to this Court because it was not raised in the Parents' Amended Request. (See SRO Decision at 10). Nevertheless, even if the Parents had properly raised this argument in the Amended Request, it is irrelevant the program ultimately was remote because the substantive adequacy of an IEP is to be determined at the time it is developed, which was before the switch to a remote program was announced. See K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ., 530 F. App'x 81, 87 (2d Cir. 2013) (summary order) ("the appropriate inquiry [regarding the adequacy of an IEP] is into the nature of the program actually offered in the written plan, not a retrospective assessment of how that plan would have been executed").

the conclusion reached by J.Y.'s private psychologists and providers that a residential placement is necessary should be afforded primary weight because those professionals knew J.Y. best, as compared to the members of the CSE, who did not know J.Y. as well and advocated for a day-treatment program.

The District, on the other hand, argues the Court should defer to the SRO's decision, which the District argues is well-reasoned and supported by a preponderance of evidence in the record.

The Court agrees with the District.

A.    SRO Deference

Here, the SRO Decision is entitled to deference because the record before this Court is the same as that before the SRO, the Parents' challenge turns on the substantive adequacy of an IEP, and the SRO Decision is well-reasoned and grounded in thorough analysis of the evidence. M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 244.  Accordingly, the Court will not defer to the IHO's contrary conclusions.

Regarding the factual record, the SRO thoroughly reviewed, relied on, and discussed the facts in the record, including all information available to the CSE at the time it created each IEP, the IEPs and other materials issued by the CSE, the testimony and evidence presented at the IHO hearing, and the IHO Decision.

Regarding the law, the SRO Decision accurately reviews relevant legal authority, including that the Second Circuit requires objective evidence that a student cannot obtain an educational benefit in a less restrictive setting before a CSE may find a residential placement is required by the IDEA, and the state law requirement that "a district must make the determination

that there is no appropriate non-residential school available consistent with the needs of the

student" before properly recommending a residential placement.  (SRO Decision at 15).

Accordingly, the Court concludes the SRO Decision is entitled to deference.  See K.L. ex

rel. M.L. v. N.Y.C. Dep't of Educ., 530 F. App'x at 85–86 (deferring to SRO Decision regarding

substantive challenges to the student's FAPE as "precisely the kind of educational policy

judgment to which [the Court] owe[s] the state deference if it is supported by sufficient

evidence").

B.      The Placements Offered by the IEPs Were Appropriate

The Court also concludes the sufficiency of each IEP is supported by a preponderance of

objective evidence in the record.

The Court examines each school year in turn.

1.      2019–2020 School Year (Eleventh Grade)

The 2019–2020 IEP recommended that J.Y. attend a therapeutic day-treatment program

at River View.  The evidence before the CSE developing this IEP included J.Y.'s report card,

transcript, a teacher progress report, a work sample, Dr. Stewart's psychological evaluation, and

the results of assessments performed by the District.  (J-16 at 3).

The teacher progress report issued by Barnstable, where J.Y. attended a day program,

indicated J.Y. was performing at grade level with respect to reading, math, and writing, and in

fact, his math and overall language skills were "above average."  (J-17 at 1); see Walczak v. Fla.

Union Free Sch. Dist., 142 F.3d at 130 ("the attainment of passing grades and regular

advancement from grade to grade" in a mainstream class "are generally accepted indicators of

satisfactory progress").  The progress report noted J.Y. "struggle[d] with frustration tolerance

when things are challenging and less structured" and he could refuse to follow directions, but he

23

was "typically able to follow rules" and had developed successful relationships.  (J-17 at 2).  The

Barnstable report also noted J.Y. "benefits from small group instruction."  (Id. at 3).

Moreover, J.Y.'s first semester report card from the 2018–2019 year at Barnstable, where

he attended day school, reflects grades of eighty-five to ninety-three percent except for United

States History 2 in which he scored seventy-five percent.  (J-19).

Finally, the SRO concluded—and the IHO credited testimony that—Dr. Stewart's

recommendations for J.Y.'s treatment could be met by the District's recommended River View

program.  (J-16; IHO Decision at 26; SRO Decision at 17–18).

Accordingly, giving due weight to the SRO Decision, and based on the Court's

independent examination of the record, the Court concludes the District's 2019–2020 IEP was

reasonably calculated to enable J.Y. to access educational benefits, and therefore provided J.Y.

with a FAPE.

2.     <u>2020–2021 School Year (Twelfth Grade)</u>

The 2020–2021 IEP continued to recommend a therapeutic day-treatment program at

River View, but with increased supports and services, and also recommended a summer program

at River View with additional counseling.  The evidence before the CSE in developing this IEP

included J.Y.'s academic summaries, progress reports, treatment plans, and transcripts from his

prior year at Heritage, an addendum to Dr. Stewart's prior psychological report, and prior

educational and psychological evaluations.  (J-36 at 3–4).

As the SRO noted, a review of this evidence does not support a finding that J.Y.'s

emotional or behavioral regulation improved at Heritage.  For example, the Heritage progress

report for October 2019 noted J.Y. "will usually AWOL at least three times per week if not

more" and that J.Y. "has been aggressive with students as evidence [sic] by him hitting a student

with a hat and throwing his backpack at another." (J-29 at 17).  Reports of aggressive behavior towards peers or staff at Heritage continued through spring 2020. (J-30 at 7–8, 10–13).

Academically, J.Y.'s grade point average dropped to a 1.79 during his first term, before improving following winter break, and his grades remained consistently high (near a 4.0 grade point average) when Heritage introduced a project-based learning model, the learning model employed at River View. (J-31; J-33 at 8; J-35 at 2).  Moreover, Heritage representatives "advised the CSE that [J.Y.] was on academic probation 30% of the third term." (J-35 at 1).

Heritage representatives also informed the CSE that, although they were concerned J.Y. did not have the "stamina to undergo another change [back to a day program] and remain stabilized," he would "need to transition at one time or another" to a non-residential setting. (J-35 at 3).  Particularly considering J.Y. was going into twelfth grade, the CSE concluded "the time for transition, with the needed supports, family wrap around services and a comprehensive therapeutic program should begin now for the 2020–21 school year" and the summer 2020 program would adequately support the transition for J.Y. and the Parents. (Id.)

To respond to J.Y.'s behavioral regression at Heritage, the CSE increased the supports and services recommended in the 2020–2021 IEP by adding small group counseling sessions, breaks during the school day, support for transitions (i.e., when J.Y. completed an assignment or finished a class), and additional testing accommodations, as well as summer school services in an 8:1+1 special BOCES class with accompanying individual, small group, and parent counseling.

As the SRO concluded, "[w]hile the June 2020 CSE may have had objective evidence that [J.Y.] had demonstrated regression in a particular out-of-State residential placement separated from his family, this does not equate to objective evidence tending to support a finding that [J.Y.] could not obtain educational benefit in a less restrictive setting than residential given

25

appropriate therapeutic supports."  (SRO Decision at 23).  To the contrary, objective evidence in the record from J.Y.'s placements at Barnstable and Heritage supported the CSE's recommendation, particularly in light of the fact that J.Y. had never been placed in a comprehensive therapeutic day-treatment program.

Accordingly, the Court concludes there is sufficient evidence in the record that the River View placement was reasonably calculated to allow J.Y. to access his education, and thus the District's IEP provided J.Y. a FAPE for the 2020–2021 school year.

C.  <u>Contrary Conclusions of Private Providers</u>

Because the substantive adequacy of the IEPs is supported by a preponderance of evidence in the record, the fact that Dr. Stewart and professionals at Heritage and Aspiro recommended a residential placement does not change the conclusion that the District's proposed placements were adequate.

In fact, the record reflects the CSE <u>did</u> consider Dr. Stewart's report and the input from the Heritage and Aspiro professionals, both in changing J.Y.'s disability classification from Emotional Disturbance to Autism and in increasing the supports and services recommended in J.Y.'s IEP each year.  "[T]he mere fact that a separately hired expert has recommended different programming does nothing to change the deference owed to the district and its trained educators."  <u>CN ex rel. EN v. Katonah Lewisboro Sch. Dist.</u>, 2020 WL 7496435, at *14 (S.D.N.Y. Dec. 21, 2020) ("While here there were multiple private experts who recommended a residential placement for [the student] the SRO's opinion that a therapeutic day program with before- and after-school supports provided a FAPE is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers.").

Accordingly, the contrary recommendations by these professionals do not change the Court's conclusion that the District's IEPs offered J.Y. a FAPE.

    D.  <u>Appropriateness of Parents' Placement</u>

Because the Court concludes the District offered J.Y. a FAPE for each of the 2019–2020 and 2020–2021 school years, the Court does not reach the questions of whether the Parents' placement was appropriate or whether equitable considerations support their reimbursement claim.  <u>See</u> <u>M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.</u>, 226 F.3d 60, 66 (2d Cir. 2000).

<strong>CONCLUSION</strong>

The Parents' motion for summary judgment is DENIED.

The District's motion for summary judgment is GRANTED.

Accordingly, the decision of the state review officer is affirmed with respect to both the 2019–2020 and 2020–2021 school years.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion and Order would not be taken in good faith, and therefore <u>in</u> <u>forma</u> <u>pauperis</u> status is denied for the purposes of an appeal.  <u>Cf.</u> <u>Coppedge v. United States</u>, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate the pending motion (Doc. #20) and close this case.

Dated:  November 7, 2022
      White Plains, NY

                    SO ORDERED:

                    _____
                    Vincent L. Briccetti
                    United States District Judge